1
2
3

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

4
5

PAUL REHBERGER, individually
and on behalf of all others similarly
situated,

Plaintiffs,

v.

HONEYWELL INTERNATIONAL,
INC.,

Defendant.

Civil No. _____

**CLASS ACTION COMPLAINT
FOR DAMAGES AND
EQUITABLE RELIEF,
AND DEMAND FOR JURY TRIAL**

6
7
8
9
10
11
12
13
14

15

    Plaintiff Paul Rehberger, individually and on behalf of all others similarly

16
17

situated, through his counsel, alleges the following upon personal knowledge as to

his own acts, and upon information and belief as to all other matters.

18

19

## NATURE OF THE ACTION

20

1.    Plaintiff Paul Rehberger purchased a Honeywell F50F Electronic Air

21
22

Cleaner ("F50F") manufactured by Honeywell, and suffered damages as a result. On

information and belief, the Honeywell F50F is markedly similar to the Honeywell

23
24

F300, with the exception of the external housing, which is different on the F50F.

25

## PARTIES

26

2.    Plaintiff Paul Rehberger is a resident of Howell, New Jersey. He

27
28

purchased a Honeywell F50F Electronic Air Cleaner ("F50F") manufactured by

Honeywell, and suffered damages as a result.

3.      Defendant Honeywell International Inc. ("Honeywell") is a Delaware corporation with its headquarters and principal place of business in Morristown, New Jersey. Honeywell manufactured the F50F purchased by plaintiff Paul Rehberger.

## JURISDICTION AND VENUE

4.      The Court has jurisdiction over the lawsuit under 28 U.S.C. § 1331, because plaintiffs' claims arise, in part, under the laws of the United States. The Court also has jurisdiction under 28 U.S.C. § 1332(d), the class Action Fairness Act, because the suit is a class action, the parties are minimally diverse, and the amount in controversy exceeds $5,000,000.00, excluding interest and costs. This Court also has supplemental jurisdiction over plaintiff state law claims, pursuant to 28 U.S.C. § 1367(a), because such claims are so related to the plaintiff federal law claims that they form part of the same case or controversy.

5.      Venue is proper in this district under 28 U.S.C. § 1391(a)(1) and (a)(2) because Honeywell resides in this district and a substantial part of the events or omissions giving rise to this claim occurred in this district. The Court has in personam jurisdiction over the defendant because at all relevant times, the Defendant resided, was found, had an agent or transacted business in New Jersey, and plaintiff purchased a F50F Electronic Air Cleaner manufactured by Honeywell.

## FACTUAL BACKGROUND

6.      Paul Rehberger, and his family, including three children, moved into their home in Howell, New Jersey on or about 1988. They were the home's first occupants.

7.     At the time, Mr. Rehberger and his family were in good health. His family had no health issues or problems.

## A.  The Rehbergers Install a Honeywell F50F Electric Air Cleaner

8.     Years after moving into his home, Mr. Rehberger became concerned about dust and pollen. Mr. Rehberger, who works in the plumbing and heating industry, understood Honeywell manufactured high-efficiency air cleaners that purportedly could clean the air his family breathes, as well as remove dust and pollen.

9.     In addition, Mr. Rehberger, through his work, noticed more homes were installing air cleaning systems. Honeywell was the dominant brand Mr. Rehberger observed in homes. Mr. Rehberger also reviewed literature, including a Honeywell sales brochure, concerning its air cleaners.

10.     In 2005 Mr. Rehberger redid the ductwork in his home. This included replacing an older "air handler" in his home's attic.

11.     At the time Mr. Rehberger replaced the ductwork and air handler, he installed the Honeywell F50F unit. The Rehbergers selected Honeywell's F50F because the unit had a removable and reusable air filter.

12.     Plaintiff believed Honeywell was the best, most reliable unit to install for his family, to help ensure the air quality in their home.

13.     Mr. Rehberger installed the unit, and carefully reviewed the manual concerning his new Honeywell F50F. In particular Mr. Rehberger read the manual's specific cleaning instructions for the removable "cells."

## B.  The Rehbergers Become Sick after Installing the Honeywell Unit

14.    Mr. Rehberger would often run his Honeywell unit, especially during the winter.

15.    Within a year of installing the unit, the Rehbergers noticed a strange odor within the home. Unaware of Honeywell's ozone problem, Mr. Rehberger believed the odor emanated from the home itself.

16.    At the same time they noticed the onset of the strange odor, Mr. Rehberger's family started to get ill. The family illnesses included sinus infections and chronic congestion.

17.    The problems continued to get worse in early 2007. The odor also worsened, as did the health of plaintiff's family.

18.    Mr. Rehberger was getting sinus and upper respiratory infections. The respiratory problems led Mr. Rehberger in 2007 to see an ear, nose and throat specialist.  Mr. Rehbegger's wife also started having upper respiratory and sinus infections.  The family's younger daughter had trouble breathing in the house.

19.    Their son also was required to visit with an ENT specialist, and he had sinus surgery three years ago.   And their eldest daughter required nasal decongestants.

## C.  Mr. Rehberger Discovers His Honeywell F50F Is Responsible for the Strange Odor in His Home

20.    During this time Mr. Rehberger was unaware Honeywell air cleaners were emitting far more ozone than was advertised.

21.     In April 2010, during a filter cleaning, Mr. Rehberger ran the Honeywell unit without replacing the cells. Plaintiff ran his Honeywell F50F for twenty-four hours without the cells.

22.     After just a day Mr. Rehberger and his family noted the smell from the home had disappeared. Realizing this was the first time he had run the Honeywell F50F without its cells, Mr. Rehberger made the connection between the ozone smell in the home and the Honeywell F50F.

23.     Mr. Rehberger immediately discussed the situation with a colleague. The colleague recommended he replace the Honeywell F50F.

**D.   Mr. Rehberger Seeks Help from Honeywell, but Honeywell Instead Blames Plaintiff for Any Malfunction with the Electric Air Cleaner**

24.     Soon after realizing the F50F didn't produce the odor with the cells removed, Mr. Rehberger contacted Honeywell via telephone to discuss what he had discovered and to request replacement cells.

25.     But instead of assisting Mr. Rehberger and his family—or alerting them to the fact Honeywell electric air cleaners emit far more ozone than previously disclosed—Honeywell sought to blame Mr. Rehberger for the problem.

26.     In April 2010, after complaining to Honeywell, Mr. Rehberger was connected with a Honeywell specialist/technician from the support line. After describing the odor problem and telling the specialist that removal of the F50F's cell seemed to cure the odor problem, the Honeywell specialist became evasive.

27.     First, the Honeywell technician repeatedly asked Mr. Rehberger whether he had caused the problem by improperly installing or cleaning the cells.

The Honeywell representative even said the "liquid detergent" Mr. Rehberger had used to clean the F50F's cells may have caused the odor.

28.    Mr. Rehberger assured the Honeywell representative he was in the plumbing and heating business and had carefully read Honeywell's instructions on cleaning the F50F's cells. Mr. Rehberger explained he had followed all the instructions, the smell had nothing to do with liquid detergent, and again Mr. Rehberger noted removal of the cells appeared to cure the problem.

29.    The Honeywell representative then shifted tactics, saying the "voltage" in Mr. Rehberger's home may have been one volt higher or lower than the 120 volts the F50F requires. But while the Honeywell representative was on the phone, Mr. Rehberger, who regularly tests voltages, used his own "voltage tester" at the exact point where the F50F is connected to the electrical supply. While the Honeywell representative was on the phone, Mr. Rehberger was able to confirm the power in his house, and the power to the unit, was operating at the correct 120 voltage.

30.    The Honeywell technician continued to be evasive and became rude, at which time Mr. Rehberger realized the conversation was pointless. Thereafter Mr. Rehberger undertook to research the issue, and thereafter discovered complaints about Honeywell electric air cleaners that emit far more ozone than is advertised or disclosed by Honeywell.

### E. The Rehberger Family's Health Improves after They Jettison the F50F's Removable and Reusable Cells

31.    Following their discovery of the complaints about Honeywell electric air cleaners, Mr. Rehberger refused to reinstall the cells that caused the rampant ozone production in his home.

32.   Instead Mr. Rehberger installed a "paper" filter to help filter the air.

33.   Since that time, the family's health has improved markedly. Among other things, family members are able to sit in the home without becoming highly congested. Sinus infections and respiratory issues have subsided.

34.   Mr. Rehberger would have read any email or letter from Honeywell warning of true ozone levels produced by the F300 and the F50F, as well as any health effects associated with those levels had such a communication been provided to him by Honeywell. But Mr. Rehberger received no such communication from Honeywell.

35.   Mr. Rehberger was unaware of the negative health effects associated with ozone gas, which was produced by the F300 and F50F. The Honeywell F50F was plainly labeled as an "air cleaner" and carried no conspicuous warnings that would indicate any dangers from exposure to ozone associated with their use.

36.   Until he removed the F50F's cell and ran the machine for twenty-four hours, no one in the Rehberger's home had any suspicion that ozone generated by the Honeywell F50F caused their illnesses. Only after the filters were removed did Mr. Rehberger read and learn electronic air cleaners were a source of poor indoor air quality and learned about the dangers of indoor ozone pollution.

**F.  The Honeywell F50F Electronic Air Cleaner in the Rehberger's Home**

37.   The air cleaner in the Rehberger home is an F50F Electronic Air Cleaner manufactured and marketed by Honeywell.

38.   The F50F purchased by the Rehbergers came with a Product Data Sheet (submitted herewith as Exhibit 1, "Product Data Sheet").

39. The F50F Product Data Sheet has one section on ozone entitled "Modification to Reduce Ozone Odor." Product Data Sheet, p. 14.

40. The F50F Product Data Sheet also states: "The electronic air cleaner contributes .005 to .010 ppm [parts per million] of ozone to the indoor air. The U.S. Food and Drug Administration and Health and Welfare Canada recommend that indoor ozone concentration should not exceed 0.050 ppm."

41. The F50F Product Data Sheet contains no statements or warnings alerting consumers to any health effects of ozone.

42. The Product Data Sheet further states the F50F "captures a significant amount of the airborne particles 0.3 micron and larger from air circulated through it."

43. In materials available on Honeywell's website, which appear to be directed to consumers (submitted herewith as Exhibit 2), Honeywell states:

> The Honeywell Electronic Air Cleaner is an advanced, easy-to-use, whole house solution that traps and filters up to 98% of pollutants from the air passing through your heating and cooling system. This advanced air cleaner captures microscopic impurities like dust, smoke and smog particles in addition to larger particles like mold spores and cat dander." Honeywell Air Cleaning, http://yourhome.honeywell.com/Consumer/Cultures/enUS/Products/Air +Cleaners (last visited Mar. 30, 2010).

44. In other materials available on Honeywell's website, which appear to be directed to contractors (submitted herewith as Exhibit 3), Honeywell claims, "[t]esting shows high-efficiency electronic air cleaners collect particles known to trigger allergic reactions . . . [e]xplain which allergens are captured" with a Honeywell "Electronic Air Cleaner and you'll have your customer's full attention.

Then show them the data documenting the trial results–and you'll have them buying."

45.     Honeywell's Owner's Guide (submitted herewith as Exhibit 4, "Owner's Guide") also states that "[e]lectronic air cleaners generate a very small amount of ozone, about 0.005 to 0.010 parts per million (ppm)."  However, the Owner's Guide does not make any mention of the health effects associated with indoor concentrations of ozone.   Owner's Guide, p. 13.

46.     A search of the term "ozone" on Honeywell's website reveals no text addressing the fact that the F300 and the F50F have been linked to much higher levels of ozone production than those stated in Honeywell's Owner's Guide and Product Data Sheet, that the ozone gas produced by the F300 and the F50F has been proven to cause numerous health problems, as listed herein, that many persons are highly sensitive to ozone and at risk for such health problems, that exercise in indoor areas with ozone contamination can heighten the health problems associated with ozone, that ozone can pool at high concentrations near vents and other areas, that ozone can react with household products and thereby reduce indoor air quality by filling the air with toxic contaminants, or that effective air cleaners were on the market that generated no ozone and thus posed none of the health problems associated with that toxic gas.

47.     Honeywell is aware of the existence of alternative air cleaner designs that clean air without omitting any ozone.

48.     Honeywell markets such air cleaners under the Honeywell brand name, in addition to manufacturing and marketing the F300 and the F50F.

49.   Such air cleaners are known as "HEPA". As described on Honeywell's website, "HEPA stands for High Efficiency Particle Arresting, which is the standard that achieves 99.9% air filtration." Honeywell Air Cleaning, http://yourhome.honeywell.com/Consumer/Cultures/en-US/Products/Air+Cleaners/HEP (last visited Mar. 30, 2010).

50.   In addition to producing ozone-emitting electrostatic units like the F300 and the F50F and ozone-free alternative HEPA units, Honeywell licenses its name to Kaz, Inc., which sells portable Honeywell air cleaners.

51.   Kaz, Inc. prominently features the Honeywell logo on websites promoting Honeywell Quiet Clean portable air cleaners, and these products' websites can be accessed from Honeywell's corporate site. Kaz, Inc.'s website emphasizes that "True HEPA" filters have the benefit of producing no ozone.

52.   Kaz, Inc. issued a report over Market Wire on February 1, 2008, entitled "Air Purifiers Can Help Improve Dangerous Indoor Air Quality, but Not All Purifiers Are Created Equal." That report draws a clear distinction between "True HEPA" devices and other air cleaners. The report states that "[t]rue HEPA air purifiers use a mechanical filtration system to remove particles from the air, so ozone is not emitted during the filtration process. Ozone free air purifiers with True HEPA filters, like the Honeywell True HEPA models, are recommended by physicians . . . If you suffer from asthma, severe allergies or any other type of breathing disorder, you should only purchase True HEPA air purifiers that use a fan and a True HEPA filter (referred to as mechanical filtration)." Market Wire, February 1, 2008 (submitted herewith as Exhibit 5).

### G.  The Well-Recognized Link between Ozone Exposure and the Rehberger Family's Symptoms

53.    Ozone exposure has long been a recognized cause of breathing difficulties of the sort experienced by Mr. Rehberger.

54.    As described by the U.S. Environmental Protection Agency ("EPA"), "Ozone is a molecule composed of three atoms of oxygen. Two atoms of oxygen form the basic oxygen molecule – the oxygen we breathe that is essential to life. The third oxygen atom can detach from the ozone molecule, and re-attach to molecules of other substances, thereby altering their chemical composition." EPA, "Ozone Generators that are Sold as Air Cleaners,"

http://www.epa.gov/iaq/pubs/ozonegen.html (last visited Mar. 30, 2010).

55.    "The same chemical properties that allow high concentrations of ozone to react with organic material outside the body give it the ability to react with similar organic material that makes up the body, and potentially cause harmful health consequences. When inhaled, ozone can damage the lungs." EPA, "Ozone Generators that are Sold as Air Cleaners," http://www.epa.gov/iaq/pubs/ozonegen.html (last visited Mar. 30, 2010).

56.    "Ozone exposure causes constriction of breathing passages making normal respiration much more difficult." John W. Hollingsworth, M.D., "New Treatment Found for Ozone-Caused Wheezing," National Institute of Environmental Health Sciences, available at

http://www.niehs.nig.gov/research/supported/sep/2009/wheezing.cfm.

57.    Thus, "[h]ealthy people . . . can experience breathing problems when exposed to ozone." EPA, "Ozone Generators that are Sold as Air Cleaners," http://www.epa.gov/iaq/pubs/ozonegen.html (last visited Mar. 30, 2010).

58.    "Epidemiological studies have demonstrated a strong association between high ambient [ozone] concentration with cardiovascular and respiratory morbidity and mortality. [O]zone exposure elicits airway inflammation characterized by neutrophil accumulations and liberates multiple inflammatory mediators . . . as an early inflammatory event." Hyoung-Kyu Yoon, Hye-Youn Cho and Steven R. Kleeberger, "Protective Role of Matrix Metalloproteinase-9 in Ozone-Induced Airway Inflammation," Environmental Health Perspectives, November 2007.

59.    "Responses to ozone pollution vary from one individual to another, sometimes for reasons we don't yet understand. The U.S. Environmental Protection Agency (EPA) estimates that 5 to 20 percent of the total U.S. population has an unexplained greater susceptibility." NASA Earth Observatory, "The Ozone We Breathe," http://earthobservatory.nasa.gov/ Features/Ozone we Breathe/printall.php (last visited Mar. 30, 2010).

60.    "Exercise during exposure to ozone causes a greater amount of ozone to be inhaled, and increases the risk of harmful respiratory levels of ozone, but health effects may become more damaging and recovery less certain at higher levels or from longer exposures." EPA, "Ozone Generators that are Sold as Air Cleaners," http://www.epa.gov/ iaq/pubs/ozonegen.html (last visited Mar. 30, 2010).

61.    When used indoors in the presence of ozone, many household cleaners and air fresheners emit toxic pollutants. William W. Nazaroff, California Air

Resources Board, "Indoor Air Chemistry: Cleaning Agents, Ozone and Toxic Air Contaminants, available at http://www.arb.ca.gov./ research/abstracts/01-336.htm.

62.    "Studies increasingly suggest that ozone creates other irritants as it reacts with household products such as scented cleaners and air fresheners." Consumer Reports, "Air cleaners – filtering the claims," available at http://www.consumerreports.org/cro/appliances/heating-cooling-and-air/air-purifiers/air-purifiers.

### H.  The Honeywell Air Cleaners Generate Ozone at Levels Far Exceeding Those Stated in Its Product Data Sheet and Owner's Guide

63.    A recent study conducted by the University of Oklahoma has evaluated the ozone-producing properties of electrostatic air cleaners – the type of air cleaner used by the Rehbergers. L. Tanasomwang and F.C. Lai, "Long-Term Ozone Generation From Electrostatic Air Cleaners," IEEE Industry Applications Society Conference Record, vol. 3, pp. 2037 (IEEE, 1997).

64.    The study recognized that "for a commercial room air cleaner operated in relatively clean air, ozone generation rate increases by an order of magnitude over seven weeks as the discharge electrodes become contaminated." Tanasomwang, *supra*.

65.    The study further concluded that "a high level of ozone concentration [is] found close to the outlet." Tanasomwang, *supra*.

66.     According to published findings of Consumer Reports, the Honeywell F300 and F50F[1] generate whole house concentrations of ozone between 25 and 50 parts per billion – far higher than reported by Honeywell. Consumer Reports, "Air cleaners – filtering the claims," available at http://www.consumerreports.org/cro/appliances/heating-cooling-and-air/air-s/air-purifiers.

67.     This figure is two to ten times the amount of ozone Honeywell lists in its Product Data Sheet and its Owner's Guide. The figure does not take into account the increased levels near outlets or increased levels that can build up over time as electrostatic air cleaners generate more and more ozone.

68.     Citing the extensive research linking ozone to health problems, Consumer Reports recommends: "Buy a whole-house model with a filter rather than an electrostatic precipitator, which produces some ozone."  Consumer Reports, "Air cleaners – filtering the claims," available at http://www.consumerreports.org/cro/appliances/heating-cooling-and-air/air-s/air-purifiers.

## CLASS ACTION ALLEGATIONS

69.     Plaintiff asserts this action individually and as a class action under Federal Rule of Civil Procedure 23 on behalf of a class of persons initially defined as follows:

> all persons in the United States who have purchased Honeywell F300 and F50F Series Electronic Air Cleaners.

---

[1] The F300 and F50F are interchangeable models of electronic air cleaner.  Dealers advertise them as "identical except for paint color," *see, e.g.,*  Bel-Air Electronic Air Cleaners, http://electronicaircleaners.com/f50a-e16x25-parts.aspx (last visited 7/1/2010), and Honeywell produces identical parts lists and Owner's Guides for the F50F and F300.

70.   Excluded from the class are the Court and defendants, their officers and directors, families and legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

71.   Plaintiff reserves the right to amend or modify the class definition in connection with their motion for class certification or the result of discovery.

72.   This action is properly brought as a class action for the following reasons. The class is so numerous that joinder of the individual members of the proposed class is impracticable. The class includes thousands of persons geographically dispersed throughout the United States. The precise number and identities of class members are unknown to plaintiffs, but can be ascertained through discovery, namely using Honeywell's sales and registration records and other information kept by Honeywell, as well as the complaints Honeywell received.

73.   Plaintiff does not anticipate any insurmountable difficulties in the management of this action as a class action. The class is ascertainable and there is a well-defined community of interest in the questions of law and fact alleged since the rights of each class member were violated in similar fashion based upon defendants' misconduct.

74.   Questions of law or fact common to the class exist as to plaintiffs and all class members, and these common questions predominate over any questions affecting only individual class members. Among the common questions of law and fact are the following:

a) whether Honeywell made material fraudulent omissions influencing plaintiffs and class members by failing to reveal, either directly to consumers or to third parties installing the F300 and the F50F for consumers, the F300 and the F50F have been linked to much

higher levels of ozone production than listed in Honeywell's Product Data Sheet and Owner's Guide, the ozone gas produced by the F300 and the F50F has been proven to cause numerous health problems, as listed herein, many persons are highly sensitive to ozone and at risk for such health problems, exercise in indoor areas with ozone contamination can heighten the health problems associated with ozone, ozone can pool at high concentrations near vents and other areas, ozone can react with household products and thereby reduce indoor air quality by filling the air with toxic contaminants, and effective air cleaners are and were on the market which generate no ozone and thus pose no ozone-related health problems;

b) whether Honeywell made a material misrepresentation to consumers, either directly or through third parties installing the F300 and the F50F, by stating in the F300 and F50F Product Data Sheet that "[t]he electronic air cleaner contributes .005 to .010 ppm [parts per million] of ozone to the indoor air" when in fact the F300 and F50F has been shown to create much higher levels of ozone gas.

c) whether Honeywell had a duty to warn consumers, directly and/or through third party installers installing the F300 and the F50F for consumers, that the ozone gas emitted by the F300 and the F50F can cause serious health problems, as described herein.

d) whether Honeywell had a duty to inform consumers, directly and/or through third party installers installing the F300 and the F50F for consumers, that a large portion of the United States population has a heightened sensitivity to ozone gas and is at a particularly high risk of suffering serious adverse health effects if exposed to that gas at even low levels.

e) whether Honeywell had a duty to inform consumers, directly or through third party installers installing the F300 and the F50F for consumers, that exercise indoors could significantly increase the adverse health effects of ozone generated by the F300 and F50F.

f) whether Honeywell had a duty to inform consumers, directly and/or through third party installers installing the F300 and the F50F for consumers, that ozone generated by air cleaners can be highly concentrated at vent outlets and pool in high concentrations in certain areas.

g) whether Honeywell had a duty to inform consumers, directly and/or through third party installers installing the F300 and the F50F for consumers, that ozone generated by the F300 and F50F could react with household products and thereby diminish indoor air quality by filling the air with toxic contaminants.

- 16 -

h) whether Honeywell had a duty to inform consumers, directly and/or through third party installers installing the F300 and the F50F for consumers, that the risks associated with ozone produced by the F300 and the F50F were not a necessary byproduct of air cleaning because effective alternative air cleaners exist that produce no ozone.

i) whether Honeywell's failure to inform consumers, directly and/or through third party installers installing the F300 and the F50F for consumers, of the health problems associated with ozone, the fact that many in the population have a heightened sensitivity to ozone and are thus at risk of suffering health problems when using the F300 and F50F, the fact that the F300 and the F50F have been linked to higher levels of ozone than those stated in the F300 and F50F Product Data Sheet and Owner's Guide, the fact that indoor exercise increases ozone exposure and attendant health risks, the fact that ozone generated by the F300 and F50F can pool at high levels in certain indoor areas, the fact that ozone reacts with household products and can thereby reduce indoor air quality by filling the air with toxic contaminants, and the fact that alternative filters exist that produce no ozone constituted fraudulent concealment / fraud by omission.

j) whether Honeywell violated the Magnuson Moss Warranty Act (15 U.S.C. § 2301 et. seq.) when it marketed and sold the F300 and F50F.

k) whether Honeywell was unjustly enriched under the circumstances alleged herein;

l) whether Honeywell should be enjoined from marketing the F300 and F50F without first providing accurate information to consumers about the risks and other material information described herein;

m) whether Honeywell breached the express and implied warranties it extended to Plaintiff and other purchasers of the F300 and F50F; and

n) the appropriate type and/or measure of damages arising out of purchases of the air cleaners made by plaintiff and the class members.

75.    Honeywell engaged in a common course of conduct giving rise to the legal rights sought to be enforced by plaintiff and the class. The injuries sustained

by plaintiff and the class flow, in each instance, from a common nucleus of operative facts.

76.    Plaintiff's claims are typical of class members' claims. The defenses Defendant may assert against Plaintiff's claims are likely to be typical of the defenses Defendant may assert against the class members' claims.

77.    Plaintiff will fairly and adequately protect the class' interests. Plaintiff has no interests adverse to the class' interests and has retained counsel with significant experience in the prosecution of class actions and complex consumer litigation and who will vigorously prosecute this action.

78.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy, and the individual joinder of all class members is impracticable, if not impossible, because a large number of class members are located throughout the United States and have no particularized need to individually prosecute such claims. Individualized litigation would likewise present the potential for inconsistent judgments and would result in significant delay and expense to all parties and multiple courts hearing virtually identical lawsuits. By contrast, the conduct of this action as a class action presents fewer management difficulties, conserves the resources of the parties and the Court, and protects the rights of each class member.

79.    Honeywell has acted on grounds generally applicable to the entire class, thereby making declaratory or final injunctive relief appropriate with respect to the class as a whole.

80.    Notice of the pendency or resolution of this action can be provided to the class by mailed notice or the best notice practicable under the circumstances.

## COUNT ONE

### Violations of the New Jersey Consumer Fraud Act,
### N.J. Stat. §§ 56:8-1 *et seq.*

81.    Plaintiff incorporates by reference ¶¶ 1-80 as though fully set forth and alleged herein.

82.    This claim is asserted by Plaintiff on his own behalf and on behalf of all others similarly situated members of the Class against Honeywell.

83.    This count is brought against defendant Honeywell pursuant to the New Jersey Consumer Fraud Act, N.J. Stat. §§ 56:8-1 *et seq.*

84.    Plaintiff Rehberger is a resident of the State of New Jersey. Plaintiff Rehberger purchased his defective Honeywell F50F Electric Air Cleaner in the State of New Jersey. Plaintiff Rehberger sought repair via telephone in New Jersey.

85.    The New Jersey Consumer Fraud Act prohibits any "[f]raud, etc., in connection with sale or advertisement of merchandise or real estate as unlawful practice." N.J. Stat. § 56:8-2 andprohibits any "knowing, concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission in connection with the sale . . . of any merchandise . . ." N.J. Stat. § 56:8-2.

86.    Plaintiff Rehberger and class members reasonably expected their Honeywell F50F Electric Air Cleaners to operate as advertised and as disclosed, and to not emit poisonous ozone well in excess of safely acceptable levels.

87.    The Honeywell F300 and F50F Electric Air Cleaners are defectively designed and manufactured because, as alleged above, Honeywell repeatedly and publically misstated the amount of ozone omitted by the F300 and the F50F, stating in the Product Data Sheet, "[t]he electronic air cleaner contributes .005 to .010 ppm

- 19 -

[parts per million] of ozone to the indoor air," and making similar statements in the Owner's Guide. Honeywell knew this statement was false when made. At the latest, Honeywell was put on notice of the falsity of this statement when Consumer Reports published an article establishing the F300 and F50F produced ozone levels up to ten times higher than reported by Honeywell. Honeywell also failed to tell consumers about the defect, even after receiving numerous consumer complaints.

88.     Defendant Honeywell should have had knowledge of these defects and false statements, and was informed about the defect from the numerous consumer complaints relating to its Electronic Air Cleaners.

89.     Plaintiff Rehberger and class members were not aware of the defect at the time of sale.

90.     Had Plaintiff and class members known the Honeywell F300 and F50F Electronic Air Cleaners were defective, they would not have purchased them because the existence of the defect was a material fact to the transaction. Defendant, at all relevant times, knew or should have known Plaintiff Rehberger and class members did not know or could not have reasonably discovered the defect prior to their purchases.

91.     By paying monies for these defective Honeywell F300 and F50F Electronic Air Cleaners, Plaintiff and class members have suffered an ascertainable loss.

92.     The conduct by Honeywell constitutes a violation of New Jersey's Consumer Fraud Act and entitles Plaintiff and class members to relief under this statute of statutory and actual damages, injunctive relief, and attorneys' fees and costs.

## COUNT TWO

### Fraud by Concealment and/or Omission

93.    Plaintiff Rehberger incorporates by reference ¶¶ 1-92 as though fully set forth and alleged herein.

94.    This claim is asserted by Plaintiff on his own behalf and on behalf of all other similarly situated members of the Class against Honeywell.

95.    As alleged herein, Honeywell repeatedly and publically misstated the amount of ozone omitted by the F300 and the F50F, stating in the Product Data Sheet that "[t]he electronic air cleaner contributes .005 to .010 ppm [parts per million] of ozone to the indoor air." A similar assertion was made in the Owner's Guide.

96.    Honeywell knew that this statement was false when made. At the latest, Honeywell was put on notice of the falsity of this statement when Consumer Reports published an article establishing that the F300 and F50F produced ozone levels up to ten times higher than reported by Honeywell.

97.    Having falsely stated the amount of ozone produced by the F300 and the F50F, Honeywell had a duty to set the record straight by disclosing the true amount of ozone produced by the F300 and the F50F. It failed to do so, which failure amounted to fraudulent concealment and fraud by omission.

98.    In a separate act of fraudulent concealment and fraud by omission, Honeywell failed to disclose to consumers the well documented association between ozone and health problems; problems likely to be suffered by and thus material to the very people to whom air cleaning devices are marketed.

99.    In separate acts of fraudulent concealment, Honeywell failed to inform consumers of the fact that many in the population have a heightened sensitivity to ozone and are thus at risk of suffering health problems when using the F300 and F50F, the fact that the F300 and the F50F have been linked to higher levels of ozone than states it its Product Data Sheet, the fact that indoor exercise increases ozone exposure and attendant health risks, the fact that ozone generated by the F300 and F50F can pool at high levels in certain indoor areas, the fact that ozone reacts with household products and can thereby reduce indoor air quality by filling the air with toxic contaminants, and the fact that alternative air cleaners exist that produce no ozone.

100.    Nowhere in the Owner's Guide distributed to consumers did Honeywell reveal the ill health effects associated with ozone gas.

101.    Nowhere in the Owner's Guide did Honeywell reveal the fact many in the population have a heightened sensitivity to ozone and are thus at risk of suffering health problems when using the F300 and F50F, the fact that the F300 and the F50F have been linked to higher levels of ozone than states it its Owner's Guide, the fact that indoor exercise increases ozone exposure and attendant health risks, the fact that ozone generated by the F300 and F50F can pool at high levels in certain indoor areas, the fact that ozone reacts with household products and can thereby reduce indoor air quality by filling the air with toxic contaminants, or the fact that alternative air filters exist that produce no ozone.

102.    Honeywell revealed none of the facts described in ¶¶ 87, 89 of this Complaint on its website.

103.   Honeywell revealed none of the facts described in ¶¶ 87, 89 of this Complaint directly to installers who installed Honeywell the F300 and the F50F for consumers.

104.   Honeywell knew of the negative health effects associated with ozone gas but concealed them from consumers. Honeywell has been made aware of the effects of ozone through, among other sources, published scientific literature relating to ozone, through statements made by government agencies, through awareness of Consumer Reports' reviews of the F300 and F50F, and through statements made by its licensee, Kaz, Inc., on websites touting Honeywell brand air cleaners and in media releases.

105.   Honeywell knew about electric air cleaners that do not produce ozone gas through its marketing of such air cleaners under the Honeywell brand name.

106.   Honeywell had a duty to disclose the ill health effects associated with ozone gas because (1) ozone contamination is a health and safety issue which creates a duty of disclosure and (2) Honeywell's statements about the levels of ozone gas produced by the F300 and F50F are false and misleading without the addition of information detailing testing showing much higher levels of ozone, the fact that ozone can pool in high concentrations and the fact that ozone's effects are exacerbated by indoor exercise; (3) Honeywell's statements about the beneficial effects of the F300 and the F50F on air quality are misleading in the absence of additional information about the many ill health effects associated with ozone exposure, the heightened sensitivity of many in the population to ozone and the other facts it failed to disclose, as detailed herein.

107.   Honeywell intentionally concealed the amount of ozone generated by the F300 and the F50F (and the existence of testing by Consumer Reports establishing that amount), the sensitivity of members of the population to ozone, the effects of ozone on human health, the fact that exercise increases exposure, the fact that ozone pools in high concentrations, the fact that ozone reacts with household products and the fact that effective ozone free air cleaners are superior for many individuals and readily available intentionally or with reckless disregard for the truth amounting to intent to deceive the Plaintiff and the Class.

108.   Plaintiff and class members relied on Honeywell's representations and lack thereof—omissions—as the information concealed was the sort of information that consumers would take into account when purchasing air cleaning devices. Plaintiff relied on omissions passed on by installers, who, but for the omissions of Honeywell, would have fully informed Plaintiffs of the material facts concealed by Honeywell. Plaintiff further relied on omissions concealed when Honeywell failed to place any prominent warnings on its "air cleaners" warning consumers of the production of ozone by the F300 and the F50F and associated health effects. Plaintiff would have read such warnings had they been made.

109.   Honeywell intentionally failed to label the F300 and F50F with any warnings or any information that would lead the ordinary consumer to know or suspect that the product may be harmful to the consumer.

110.   Honeywell knew or should have known that the Plaintiff and the Class were unaware of the true nature of ozone exposure and the true levels of ozone produced by the F300 and F50F as ordinary consumers do not have knowledge of scientific studies and health data.   Plaintiff believes that Honeywell has received

many complaints and comments from consumers about adverse health effects from the F300 and F50F, and Plaintiff himself raised concerns with Honeywell about the products.

111.   Consumers, such as plaintiff and class members would not have purchased the F300 and the F50F had they known the ill health effects associated with ozone and other facts, listed herein, concealed by Honeywell.

112.   Honeywell withheld the above described information about the true nature of ozone exposure from third party installers who installed the F300 and the F50F for consumers with the intention and understanding that the installers would rely on Honeywell's false statements and omissions.

113.   Had such installers received truthful information from Honeywell, and not received false information about the ozone levels produced by the F300 and the F50F, they would not have sold the F300 and the F50F to consumers without passing on the true information about the ozone levels produced and associated health effects.

114.   As a direct and proximate result of Honeywell's fraudulent concealment and/ or suppression of relevant facts, plaintiff and the class members suffered damages as alleged herein.

**COUNT THREE**

**Fraud**

115.   Plaintiff Rehberger incorporates by reference ¶¶ 1-115 as though fully set forth and alleged herein.

116.   This claim is asserted by Plaintiff on his own behalf and on behalf of all other similarly situated members of the Class against Honeywell.

117.   As alleged herein, Honeywell repeatedly and publically misstated the amount of ozone omitted by the F300 and the F50F, stating in the Product Data Sheet that "[t]he electronic air cleaner contributes .005 to .010 ppm [parts per million] of ozone to the indoor air."

118.   Honeywell knew that this statement was false when made. At the latest, Honeywell was put on notice of the falsity of this statement when Consumer Reports published an article establishing that the F300 and F50F produced ozone levels up to ten times higher than reported by Honeywell.

119.   Honeywell falsely understated the amount of ozone generated by the F300 and the F50F to induce reliance by consumers, who have many options when seeking to purchase air filtration and cleaning devices. Many such options produce no ozone or far less ozone than the levels associated with the F300 and F50F.

120.   Honeywell made its false statements with regard to the amount of ozone generated by the F300 and the F50F intentionally or with reckless disregard for the truth.

121.   Plaintiff and class members relied on Honeywell's false statements. Honeywell specifically sold and marketed the products as "air cleaners" knowing that the consumers to whom the product was directed would, as the Rehbergers did in fact, rely on the Company's representations that the air would be cleaner and/or safer after using the Honeywell Electronic Air Cleaners.  Plaintiff relied on, and had no reason to question, the recommendations of and the generalized use of the F300 and F50F models by other professionals in his line of work who installed air cleaners in people's homes.

122.   Plaintiff and class members would not have purchased the F300 and the F50F had they known the machines produce dangerous ozone levels.

123.   Honeywell made the above-described false statements to third party installers who installed the F300 and the F50F for consumers with the intention and understanding that the installers would rely on Honeywell's false statements and omissions.

124.   Had such installers received truthful information from Honeywell, and not received false information about the ozone levels produced by the F300 and the F50F, they would not have sold the F300 and the F50F to consumers without passing on the true information about the ozone levels produced and associated health effects.

125.   As a direct and proximate result of Honeywell's misrepresentations, plaintiff and the class members suffered damages as alleged herein.

**COUNT FOUR**

**Negligent Misrepresentation**

126.   Plaintiff Rehberger incorporates by reference ¶¶ 1-125 as though fully set forth and alleged herein.

127.   This claim is asserted by Plaintiff on his own behalf and on behalf of all other similarly situated members of the Class against Honeywell.

128.   In making the misrepresentations complained of herein, Honeywell was acting in the course of its business, and in the context of a transaction in which it had a pecuniary interest, *e.g.*, the sale of the F300 and the F50F to consumer purchasers.

129.   In making the misrepresentations complained of herein, Honeywell supplied faulty information meant to guide. Specifically, Honeywell supplied information to plaintiff and the class members that the "[t]he electronic air cleaner contributes .005 to .010 ppm [parts per million] of ozone to the indoor air." Honeywell also failed to take any reasonable steps to correct its misstatements or inform plaintiff or the class members of the true nature of such air cleaners by revealing the information it fraudulently withheld, as described more fully herein.

130.   Honeywell failed to exercise reasonable care in obtaining or communicating material information about the quality and safety of the F300 and the F50F to plaintiff and the class members, including the fact the F300 and the F50F generated much higher levels of ozone gas than Honeywell represented.

131.   Honeywell's statements that "[t]he electronic air cleaner contributes .005 to .010 ppm [parts per million] of ozone to the indoor air" were highly material to decisions made by Plaintiff and the class members to purchase the F300 and the F50F. Plaintiff and class members reasonably and justifiably relied on such statements to their detriment. But for the deceptive representations of Honeywell as alleged herein, Plaintiff and class members would not have purchased the F300 and the F50F.

132.   But for Honeywell's repeated misstatements to the general public as well as experts in the field, the Plaintiff and the Class would not have purchased Honeywell's electrostatic air cleaners.

133.   Honeywell made the above described misstatements to third party installers who installed the F300 and the F50F for consumers with the intention and understanding that the installers would rely on Honeywell's false statements.

134.   Had such installers received truthful information from Honeywell, and not received erroneous information as described above, they would not have sold the F300 and the F50F to consumers without passing on the true information about the ozone levels produced and associated health effects.

135.   As a direct and proximate result of Honeywell's misrepresentations, plaintiff and the class members suffered damages as alleged herein.

## COUNT FIVE
### Breach of Express Warranty, N.J. Stat. § 12A:2-313

136.   Plaintiff incorporates by reference ¶¶ 1-135 as though fully set forth and alleged herein.

137.   This claim is asserted by Plaintiff on his own behalf and on behalf of all others similarly situated members of the Class against Honeywell.

138.   Honeywell is a seller for purposes of New Jersey's express warranty statute, codified at N.J. Stat. § 12A:2-313.

139.   Honeywell extended to Plaintiff and all other buyers in the putative class an express warranty that the product was "free from defects." Owner's Guide, p. 16.

140.   This express warranty constitutes a promise made by the seller to all buyers relating to the quality of the goods sold, namely the F300 and F50F, and constitutes a basis of the bargain between Honeywell and the various purchasers.

141.   The F300 and F50F were not free from defects as warranted. Defects in the workmanship and materials, as well as defects in design and labeling, directly and proximately caused substantial injury to the Plaintiff as well as to members of the Class.

- 29 -

142.   Honeywell had ample notice of the claims relating to its breach of the express, limited warranty it extended to Plaintiff and members of the Class.   In addition to the notice provided by this and other complaints filed by parties injured by Honeywell's defective air cleaners, notice was provided through telephone and e-mail complaints lodged with Honeywell's consumer response department by Plaintiff Rehberger and other injured parties.

143.   As a direct result of Honeywell's breach of its express warranty, Plaintiff and the Class are entitled to compensatory damages.

## COUNT SIX

### Breach of Implied Warranty, N.J. Stat. § 12A:2-314

144.   Plaintiff incorporates by reference ¶¶ 1-143 as though fully set forth and alleged herein.

145.   This claim is asserted by Plaintiff on his own behalf and on behalf of all others similarly situated members of the Class against Honeywell.

146.   Honeywell is a merchant with respect to goods of the kind for purposes of New Jersey's implied warranty statute, codified at N.J. Stat. § 12A:2-314.

147.   Honeywell sold the F300 and the F50F both to consumers and dealers for use by Plaintiff and other ultimate consumers.

148.   At the time it was sold by Honeywell, the F50F and F300 were not merchantable due to the various defects which exposed purchasers to risk of injury.

149.   As sold by Honeywell, the F300 and F50F were not fit for their ordinary and intended purpose – to clean and purify ambient air, thereby improving indoor air quality.

150.   As sold by Honeywell, the F300 and F50F were not adequately labeled as to the risks of ozone and were, in fact, mislabeled with regards to the amount of ozone produced.  But for this lack of labeling and mislabeling, Plaintiff and other class members would not have purchased the products.

151.   As sold by Honeywell, the F300 and F50F did not conform to promises made by Honeywell about their functioning and uses. Marketed as "air cleaners," the F300 and F50F do not, in fact, make the ambient air cleaner.  Nor do they conform to the various promises and assertions of face made in the Owner's Guide and Product Data Sheet about their quality and safety.

152.   Plaintiff and class members were injured when they purchased the F300 and F50F because they were not merchantable and contained various defects which directly and proximately resulted in injury to Plaintiff's and class members' persons and property.  Because Plaintiff and class members lacked information to determine that the F300 and the F50F were not merchantable, they paid for a product which they would not have purchased had they been made aware of the adverse health effects and known that they were defective.

153.   Honeywell had ample notice of claims relating to its breach of the implied warranty of merchantability.  In addition to the notice provided by this and other complaints filed by parties injured by Honeywell's defective air cleaners, notice was provided through telephone and e-mail complaints lodged with Honeywell's consumer response department by Plaintiff Rehberger and other injured parties.

154.   As a direct result of Honeywell's breach of the implied warranty of merchantability, Plaintiff and the Class are entitled to compensatory damages.

## COUNT SEVEN

### Violation of the Magnuson-Moss Act (15 U.S.C. §§ 2301 *et. seq.*)

155.   Plaintiff incorporates by reference ¶¶ 1-154 as though fully set forth and alleged herein.

156.   This claim is asserted by Plaintiff on his own behalf and on behalf of all others similarly situated members of the Class against Honeywell.

157.   Plaintiff and the class are consumers as defined in 15 U.S.C. § 2301(3).

158.   Defendants are suppliers and warrantors as defined in 15 U.S.C. § 2301(4)(5).

159.   The defective air cleaners are consumer products as defined in 15 U.S.C. § 2301(6).

160.   In April 2010, the Plaintiff spoke with a technician at Honeywell and informed the technician of the extreme and adverse health effects that the F50F's cell, and specifically the ozone discharged by that cell, caused to him and his family, thereby giving Defendant constructive notice of claims by purchasers of the F50F and F300.

161.   Additionally, Honeywell has been sued by other purchasers of F300 and/or F50F model air cleaners who were similarly injured by ozone produced by those products, thereby giving Defendant actual notice of both claims by purchasers and claims on behalf of the class of purchasers.

162.   By reason of Defendant's breaches of express and implied warranties, Defendant has violated statutory rights due Plaintiff and the Class pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et. seq.*, thereby damaging Plaintiff and the Class.

## COUNT EIGHT

### Unjust Enrichment

163.   Plaintiff Rehberger incorporates by reference ¶¶ 1-162 as though fully set forth and alleged herein.

164.   This claim is asserted by Plaintiff on his own behalf and on behalf of all others similarly situated members of the Class against Honeywell.

165.   Plaintiff and class members conferred an economic benefit on Honeywell by their purchases of the F300 and the F50F, because Honeywell received money for F300 and F50F sales even if it was not the actual end-seller of a given F300 and F50F.

166.   Honeywell appreciated, accepted, and retained this economic benefit to the detriment of Plaintiff and class members.

167.   Allowing Honeywell to retain the economic benefit it received from F300 and F50F sales would be inequitable to Plaintiff and class members because of the wrongful conduct alleged herein. Honeywell's retention of the economic benefit it received violates the fundamental principles of justice, equity and good conscience because Honeywell knowingly and intentionally concealed the nature and quality of the F300 and F50F, knowingly sold Plaintiff and the class members a defective product that did not offer the promised level of protection, and refused to make corrective statements once it became aware of the truth.

168.   As a result, Plaintiff seeks an Order requiring Honeywell to disgorge all of the profits, benefits, and other compensation they obtained from the class members as a result of its wrongful conduct.

# PRAYER FOR RELIEF

Wherefore plaintiff, individually and on the class's behalf, prays for judgment against defendant as follows:

A.     an order certifying the plaintiff class and appointing Plaintiff and his counsel to represent the class;

B.     an order enjoining Honeywell from continuing to engage in unlawful or unfair business practices;

C.     an award of actual, consequential, and punitive damages and rescission, as authorized by law;

D.     an order requiring Honeywell to disgorge all ill-gotten gains and to pay restitution to Plaintiff and the class consisting of all funds acquired by means of any business act or practice declared unlawful or unfair by the Court;

E.     Defendant pay prejudgment and post judgment interest, as authorized by law;

F.     Defendant pay reasonable attorney fees and costs of suit; and

G.     all other relief the Court deems appropriate.

# DEMAND FOR JURY TRIAL

Plaintiff and class members demand trial by jury on all issues so triable.

DATED: November 3, 2010

By: _____
William J. Pinilis (WJP2130)
PinilisHalpern, LLP
160 Morris Street
Morristown, NJ  07960
Tel:  (973) 401-1111
Fax: (973) 401-1114
wpinilis@consumerfraudlawyer.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

William J. Doyle II (188069)
John A. Lowther (207000)
James R. Hail (202439)
DOYLE LOWTHER, LLP
jim@doylelowther.com
9466 Black Mountain Road, Suite 210
San Diego, California 92126
Tel:   (619) 573-1700
Fax:   (619) 573-1701
bill@doylelowther.com
john@doylelowther.com
jim@doylelowther.com

Michael G. Stewart (BPR#16920)
J. Gerard Stranch, IV (BPR#023045)
BRANSTETTER, STRANCH
& JENNINGS, PLLC
227 Second Avenue North, 4th Floor
Nashville, TN 37201-1631
Tel:   (615) 254-8801
Fax:   (615) 255-5419
mstewart@branstetterlaw.com
gerards@branstetterlaw.com

*Proposed co-lead counsel for plaintiff
and the proposed class*